JOHN A. HORBACH, PLAINTIFF IN ERROR, v. LORIN MILLER, DEFENDANT IN ERROR.

1. **Practice**: EXCEPTIONS: MOTION FOR A NEW TRIAL. All alleged errors, occurring during the trial of a cause, must be excepted to, and complained of in the motion for a new trial, in order to obtain a review of the same in the supreme court; and error committed by the giving of an oral charge to the jury, instead of reducing such charge to writing, as required by *Gen. Stat.*, 262, is no exception to the rule.

2. **Boundaries**: EVIDENCE: INSTRUCTIONS TO JURY. The identity of a block of lots depended upon the correct location of another block, some distance off, a corner of which had been taken as an initial point in making the survey; and a surveyor testified that in 1857, a fence was erected around the block, of which he had personal knowledge; that the fence was destroyed in 1862; and in making the survey in question, he found the west line and southwest corner, by remains of fence posts, there being old bark and rotten wood about every seven feet; *held*, that the correct location of the initial point was properly submitted to the jury, upon an instruction, that in order to determine whether the fence was built upon the true line of the block, they might take into account the time when it was built, the fact that it was about the time of the survey, when the corners were easily ascertained, and if they believed the testimony warranted it, they might presume that the fence was built on the line of said block.

3. **Limitation of Actions**: STATUTORY CONSTRUCTION. The change in the statutory period for bringing actions for the recovery of real estate, from twenty-one to ten years, made by amendment to Sec. 6 of the civil

| | |
|---|---|
| 4 | 31 |
| 5 | 356 |
| 6 | 381 |
| 6 | 524 |
| 7 | 333 |
| 8 | 122 |
| 8 | 317 |
| 10 | 444 |
| 13 | 489 |
| 13 | 528 |
| 17 | 79 |
| 18 | 625 |
| 18 | 704 |
| 20 | 353 |
| 21 | 290 |
| 21 | 683 |
| 4 | 31 |
| 25 | 641 |
| 4 | 31 |
| 27 | 62 |
| 4 | 31 |
| 33 | 570 |
| 4 | 31 |
| 31 | 58 |
| 4 | 31 |
| 37 | 354 |
| 4 | 31 |
| 49 | 376 |
| 50 | 517 |
| 53 | 462 |
| 4 | 31 |
| f60 | 732 |

code, February 15, 1869, applies to actions brought since the taking effect of the amendment. The time existing between the passage and taking effect of the act, was allowed by the legislature for the purpose of bringing actions on claims then existing, before the same were barred by the new enactment.

4. ———: ADVERSE POSSESSION. The title to land becomes complete in an adverse occupant, when he has maintained an actual, continued, and notorious possession, claiming the same as his own against all persons for the full extent of the statutory period; and the enclosing of such land within a fence, the maintenance of such fence, cultivation of the land, and payment of the taxes on the same, for said period, with said intention, is sufficient in law to constitute adverse possession.

5. **Practice**: OBJECTIONS TO TESTIMONY. Where objection is made to the admission of testimony, the reason and grounds of objection should be stated.

ERROR to the district court of Douglas County.

THE action was commenced by Lorin Miller on the twelfth day of October, A. D. 1872, against John A. Horbach, to recover the possession of a tract of land, describing the same by metes and bounds, formerly known as block 172½ in the city of Omaha. Miller claimed title through Moffat, to whom Horbach and wife had deeded the premises on the sixteenth day of January, A. D., 1858. Horbach claimed title by virtue of an alleged actual, exclusive, adverse, and notorious possession, since April, A. D., 1860, and he further plead the statute of limitations. Upon the trial of the cause before Chief Justice Lake, and a jury, deeds from Horbach to Moffat, from Moffat to Allen, and from Allen to Miller were introduced in evidence, all of said deeds describing the land in controversy as block 172½ in the city of Omaha. Miller, on his own behalf, testified as follows: "I surveyed into lots and blocks this land in controversy, in 1855, for a company calling themselves the Omaha City Company; I surveyed about 1500 acres into streets, lots, blocks, and alleys. The streets running north and south were 80 feet wide, those running east and west were 66 feet wide. We commenced at the northeast corner of the tract and

numbered successively back and forth. The blocks were numbered fractionally to distinguish them from those in the city proper. The size of the lots were 66 by 132 feet south of Napoleon street, and some of them 44 by 132 feet north of Napoleon street. Ten or twelve years ago E. V. Smith resided on block, 128½, and he has resided there ever since. I was with George Smith when he made the survey mentioned in his testimony. When I surveyed the land I took extension Twenty-first street for a base line. Subsequent to this survey I have had a good deal to do with this land. In making the survey we started from the south west corner of block 128½ and run south on Eighteenth street, assuming the streets to be 66 feet wide and the lots 44 feet wide, and then run west to the center of Twenty-first street, and from thence 49 feet west to the corner of block 172½. Afterwards I got Smith to go with me and we re-measured the other way, starting at the same point as before and running west, and then south, assuming the same width of streets as before, and we came out at the same point within an inch. After I got my deed from Allen, in 1868, I and Horbach made an effort to find the corners. When on the ground, Horbach told me where he thought the corners were. I had bought the property and wanted him to go with me so that I could take possession. I took Horbach and Kennedy with me. Smith had found the corner of block 128½ without my being with him, and he showed it to me. I saw no indications of this being the corner, except what Smith showed me, an old post and a small tree which Smith had kept in memory. I saw the trees on the block where Shields used to live. I took Smith's statement as to the starting point. If his base was wrong then this survey would be imperfect."

George Smith, on behalf of the plaintiff, Miller, testified substantially as follows:

"Have been here seventeen years. I am a surveyor.

3

Did not live much in Omaha in 1858.    After that with the exception of one year I lived here.    I was not acquainted with the city blocks in Omaha at that time.    I don't know from what maps deeds were made.    There were two or three lithograph maps then in use.    [Map of the Omaha City Company shown witness, and afterwards admitted in evidence under objection on the part of defendant.]    I have made a survey and think I have ascertained where block 178½ was.    I took the south half of block 128½ as my data.    I don't know that this block was fenced in by Shields.    I used to see it in 1857 and 1858.    I had personal knowledge of the existence of a fence at that time.    It was our primitive kind of a fence, posts about seven feet apart and pickets driven in the ground.    In 1858, I lived in the house on the block.    The fence measured 220 by 284 feet (east and west).    Van Smith occupied the enclosure in 1858.    There was a tree in the north-east corner of the enclosure, only one tree.    There was a frame building in the enclosure fronting on Seventeenth street east.    The fence was destroyed in 1859 or 1860.    In 1862 there was no fence.    In digging up the ground, I thought I found the west line of the fence and the south west corner.    I found some old bark and rotten wood about every seven feet.    From this I ran a line south and west to what I thought might be block 172½.    I dug into the earth about the south west corner and found a remnant of wood that might have been a point of a stake.    It was about one inch long and one inch square.    It was about eight inches below the surface of the ground.    It was very rotten but seemed to have once been sharpened.    I staked for Miller, block 172½.    I assumed lots to be 44 by 132 feet, and the streets 66 feet wide running east and west, and 80 feet running north and south, except Twenty-first street which was 98 feet and width of lots 44 feet.    There were some stakes on the block above where Shield's house stood.    I don't know whether

there were any on this block. E. V. Smith removed some of them out of the way. I don't think I have seen any of these stakes since 1856. I know nothing of Horbach's taking any stakes away. I never measured between any two stakes on this plat. I know the distance only from the map and what Col. Miller told me. The map tells nothing and all I know about it is what has been told me. Col. Miller told me that Twenty-first street was 98 feet wide. If he was wrong, then my measurement was wrong. There is now no such block in the city of Omaha as block 172½. I know nothing except by its being checked on the map with pen and ink, and can't swear this point of a stake, I have before testified to finding, was a corner stake. It looked something like one. I don't know that the fence was on the line of lots on block 128½. I never measured between the stakes of any part of Scriptown. I know nothing about the correctness of my starting point of survey except from rumor and the data I have given. I cannot swear this ground pointed out by my survey is the same that was once called block 172½."

B. E. B. Kennedy, sworn as a witness on behalf of the plaintiff, testified as follows:

"I was with Miller and Horbach five or six years ago in an effort to locate block 172½. It was in the spring of 1868, I think. We were all on the ground and Horbach and Miller endeavored to locate this block. They did not agree as to its locality. Afterwards I prepared a quit claim deed for Miller in reference to a settlement. It was conceded the block lay on the west side of Twenty-first street. This block has never been pointed out to me on the surface of the earth."

On the part of defendant, Horbach, Louis Shield testified as follows:

"In 1868 I lived upon Horbach's tract of land. I knew Wilgoskie. I remember Lorin Miller and him coming up there to survey a block that Miller told me

he owned, and they found it in my brick yard. Miller came the first time with Kip. Second time with Wilgoskie. Kip staked it off about 35 feet further north than Wilgoskie did. I heard no objection made to it by Miller about location. Miller told me he had a block there, but would not hurt me. My brick yard lies west of Twenty-first street in Omaha, and one lot north of Nicholas street. Wilgoskie's survey staked it about 35 feet further south than Kip did."

Chauncey Wiltze, testified on behalf of the defendant as follows:

"I was in Omaha in 1856 and 1857. There was very little surveying done. When the Poppleton and Byers map was made, A. D. Jones surveyed the city proper. Sixteenth street north of the creek was 66 feet wide. This was my base of operations in laying off Horbach's addition. I measured some of those lots of the old survey, and I remember there was a variation, they did not hold out to what they purported to be."

John A. Horbach, on his own behalf, testified as follows:

"I had some conversation with Lorin Miller, in the fall of 1856, or spring of 1857. I was then living on land north of creek. The width of streets in Scriptown addition to Omaha was very indefinite. Miller told me there was vacant ground between his survey and the A. D. Jones survey or plat. He could not tell the width of it, but said it varied. I showed him some stakes between Sixteenth and Seventeenth streets near my south line, that did not range or correspond with what map claimed. He said they were not very accurate. I know Sixteenth street was sixty-six feet wide from surveys and measurements made by C. W. Shreve, surveyor, in 1856, in trying to find south line of block 180½, south of my pre-emption. I helped him to measure from stakes on Sixteenth street north of where I lived. Stakes were

oak, marked and numbered with red chalk, and stood 12 to 14 inches above the ground. I obtained width of these streets in endeavoring to determine block 180½, with Capt. Shreve. He was county surveyor. Any one could find stakes on north part of Sixteenth street from where I lived. The fence about what was known as Shields' house, called block 128½, was built by Beeson. There was more than one enclosure by fence. There was a stock corral, and also a lot of hay stacks enclosed with fence. In 1860 I fenced the west part of that eighty acres with post and board fence, four or five boards high. Hunt had a building in the field after it was enclosed. I have paid the taxes on the property ever since. Kennedy came to my office in 1868, as attorney for Miller. He claimed he could identify the property Miller claimed. I told him Miller did not own such property. I never went up to the ground in controversy with Miller to locate a block. I did meet him at one time there and Kennedy was there and we were in my field near Twentieth street, where I had laid out an addition. Miller then said he could not locate it, but spoke of where he thought it was from his recollection. He failed to find it or anything near where it was. He did not claim to have any data whereby it could be located, only in a general way, that it was in the neighborhood of the brick yard. I have kept the fence up to this time. I have never seen Miller at all, except the time I have stated as being in 1868. I never recognized Miller's claim. In fencing in surrounding lands, I necessarily enclosed block 172½."

In rebuttal, Lorin Miller testified as follows:

"When I went there with Kennedy and Horbach, Horbach asked me if I would not take land in some other place, as the block I claimed would interfere with his plat. I agreed to take eight lots in place of these. Horbach wanted pay for taxes and fences, &c. I made

a deed of the block to Horbach, but destroyed it last year."

Horbach, being recalled, testified as follows:

"I demanded of him to pay me from $150, to $250, before I would deed anything. I told Kennedy if Miller would pay me what I asked and guaranty me against any further expense on that old deed, I would give him some lots in my second addition but it was not in quantity half as much as block 172½ as claimed. I never recognized Miller's title at any time and never said I would deed him block 172½, or a like quantity."

The foregoing is the substance of the evidence introduced on the trial of the case. The court, at the request of Miller, gave several instructions, but no exception being taken to some, and the motion for a new trial not alleging error in the giving of others, they were not considered in this court. The instructions passed upon here, are stated in the opinion.

The verdict below was in favor of Miller, and Horbach brought the case here by petition in error.

*Clinton Briggs*, for plaintiff in error.

I.   A portion of the charge given by the court to the jury was not reduced to writing as required by the provisions of the act of Feb. 18, 1873. *General Statutes, Sec.* 58, *p.* 262. This act makes it the imperative duty of the judge to reduce his instructions to writing, before giving the same to the jury, and this cannot be waived by counsel except in open court, and by the entering of such waiver in the record of the case. And the act further provides that if any charge, or parts thereof, are not reduced to writing, it "shall be *error* in the trial of the cause, and *sufficient cause* for the reversal of the judgment rendered therein." The oral charge was certainly of no advantage to Horbach, and the court cannot say

how much, if any, it may have prejudiced his case. It is not necessary to determine this question, for no matter whether the charge is for or against the party objecting, he has the right to have the judgment reversed, and the cause sent back for a new trial; so says the act above mentioned.

II. The verdict is not sustained by sufficient evidence. The petition describes by metes and bounds, a certain piece of land and claims it to be identical with the lots described in the deed. It was therefore incumbent on Miller to show to a reasonable certainty, that the land described in the petition was the identical land covered by the deed, i. e., block 172½. No attempt was made to establish the location of the block by any of the original stakes, or remains of stakes, or anything else around its boundaries. But the attempt is made to establish the boundaries of block 128½, situated a quarter of a mile, perhaps, from the block in controversy. This is done for the purpose of getting a starting point. Now if this starting point was wrong, then everything about the measurement was wrong. We submit that on the evidence here given, that the verdict of the jury should be set aside.

III. The answer denies Miller's title, and then Horbach sets up title in himself acquired by an adverse possession of more than ten years.

1. It was competent for the grantor to interpose this defense as against his grantee or any one claiming under him. *Stearns v. Hendersass*, 9 *Cush.*, 497. *Tilton v. Emery*, 17 *New Hamp.*, 536. *Brackett v. Persons Unknown*, 53 *Maine*, 228.

2. "As a general doctrine it has too long been established to be now in the least degree controverted, that what the law deems a perfect possession, if continued during the whole period which is provided by statute for

the enforcement of the right of entry, is evidence of a fee." *Angell on Limitations, Sec.* 380. *Bradstreet v. Huntington,* 5 *Pet.,* 338. *Leffingwell v. Warren,* 2 *Black,* 599.

3. When lands are held by adverse possession for the time prescribed by law, and an entry is made by the holder of the written title such party will be dispossessed, in ejectment brought by the adverse possessor. *Lessee of Devacht v. L. Newsam,* 3 *Ohio,* 57. *Jackson v. Oltz,* 8 *Wend.,* 440. *Gibson v. Bailey,* 9 *New Hamp.,* 168.

4. There are two classes of adverse possessors, one where the entry is under color of title, the other where the entry is without color of right, by a mere intruder. In the former case the possession of the claimant is construed to be co-extensive with the premises as described in his paper title; in the latter case the possession is confined to the lands actually occupied. *Angell on Limitations, Sec.* 400. *Bynum v. Thompson,* 3 *Ired., Law,* 578. *Shackleford v. Smith,* 5 *Dana,* 233. *Kile v. Tubbs,* 23 *Cal.,* 431. This case belongs to the latter class.

5. What are the elements of adverse possession? As in the case of an intruder. He must be in the *actual* possession for the period prescribed by the law. The possession must be *continuous*—not interrupted. It must be open and visible. It must be such as to indicate to the owner of the paper title that his possession is usurped, and his property appropriated by another. This gives him a *right of action* against the intruder, and under our law this right of action must continue for ten years before his rights are barred. *Gen'l. Stat. Sec.* 6 *p.* 525. The actual possession must be such as to amount to a disseizure. *Miller v. Shaw,* 7 *Sergt. and Rawle,* 129. *Bell v. Longworth,* 6 *Ind.,* 273.

6. But this question is presented. Did Horbach claim the property as his own against everybody else?

If he did not, was it necessary he should do so? In this case the intention of Horbach cannot admit of a doubt. He paid the taxes during the time of his occupation. This is very significant of his intention. *Farrar v. Fessenden*, 39 *New Hamp.*, 268. He maintained a fence around the land. He refused to convey the land to Miller when he demanded a deed. He denied Miller's title. In this suit he claims as owner by virtue of the statute. There is no testimony in the case even tending to show that Horbach ever recognized Miller's title. The most that can be claimed is that there was a talk about a compromise. But this could not prejudice Horbach's rights. *State Bank of Wisconsin v. Dutton*, 11 *Wis.*, 371. *Emerson v. Boynton*, 11 *Gray*, 395.

*E. Wakeley*, for the defendant in error.

I. No exception was taken or objection made to the *manner* of giving the verbal instruction. In the motion for a new trial, it was not objected that the instruction was verbal. The instructions were in the first instance wholly in writing; that in question was a mere response to an inquiry of the jury, on their return into court, and did not come within the provisions of the statute.

II. The question of identity of the premises was solely one of fact, and on recognized principles, the verdict will not be disturbed, except in a very clear case of error. Counsel opposed, criticizes Smith's testimony as to the "point." My learned and acute friend being more accustomed to investigate "points" of law, than "points" of corner lot stakes, failed to find the "point" in question. A jury of twelve intelligent men had no trouble in discovering it, and I think any impartial investigator, either lawyer or layman, can find it without difficulty from the record.

III.   The instructions touching the statute of limitations, were correct; and I do not understand that plaintiff in error excepted to any of them. It is not necessary to parade authorities on the subject of adverse possession. In Angell on Limitations, chap. 31, the authorities are fully cited and largely commented upon. The result of them clearly is, that there must not only be possession, but possession under a claim of right, for the full period of the statute. The fact of Horbach's enclosing the block in controversy, was no evidence that he claimed to own it, for the conclusive reason that he could not possibly enclose his own land completely surrounding Miller's, without enclosing the latter. Taking the evidence all together, the jury were clearly justified in coming to the conclusion that there was no such claim of ownership by Horbach for the whole period of ten years, as to entitle him to the benefit of the statute.

IV.   Very many of the authorities hold the amendment of the statute of limitations does not apply to causes of action existing prior to the change. And all of them hold that the new statute does not apply to existing causes of action, unless a reasonable time is allowed after the taking effect of the new law, and before the new period shall elapse. In this case I submit that there was not a reasonable time for bringing the action between the first day of July, 1869, and the time when the ten years after Horbach enclosed the block in controversy expired.

GANTT, J.

The defendant in the court below brings the cause to this court by petition in error, and among the errors complained of, it is urged that the court below erred in giving to the jury the second instruction asked by Miller; also in admitting in evidence declarations of the parties,

relating to an effort to compromise the difference between them in regard to the subject matter of the suit; and in submitting to the jury the question as to the plaintiff's adverse possession of the land in controversy; but from the record it clearly appears that in respect to the ruling and charge of the court upon these matters now assigned for error, there were no exceptions taken by the plaintiff in error upon the trial of the cause in the court below. Therefore, in regard to all these alleged errors, it is only necessary to remark that in order to obtain a review in this court upon any decision, ruling or charge made or given by the district court, the party complaining must take his exceptions thereto at the proper time.

In respect to the third ground alleged for a new trial, it need only be observed that the record clearly shows the instruction asked by the plaintiff in error, was given to the jury as asked, and not refused.

It is also complained that the court erred in giving to the jury the first and fifth instructions asked by the defendant in error, and in giving a portion of the charge orally to the jury, but as these points were not made in the motion for a new trial, under the rule which seems now to be well settled, they must be considered as waived. *The Midland Pacific Railroad Co. v. McCartney*, 1 *Neb.*, 404. *Mills v. Miller*, 2 *Neb.*, 317. *Wells, Fargo & Co. v. Preston*, 3 *Neb.*, 446; and in *State v. Swartz*, 9 *Ind.*, 221, it is said "it is due to the lower court that its errors, if any, be pointed out, so that it may retrace its steps, while the record is yet under its control." It is, however, contended that by statutory provision it shall be error and sufficient cause for the reversal of the judgment, if any charge or instruction, or any portion thereof, be given to the jury by the court without first having reduced the same to writing. This is true, and it is equally true that the admission of illegal or incompetent evidence on the trial of a cause, or the refusal to give an

instruction, or the giving of an instruction to the jury, may be sufficient cause for the reversal of a judgment, yet, under the rule as settled, if the point is not made in the motion for a new trial, it will be considered as waived. Why should a small portion of a charge, orally given to the jury, be made an exception to this rule? We have heard no good reason why it should be, and we think it would be unjust to the court below to make such an exception to the rule.

Upon the question of the identity of the block in controversy, it is insisted that the court erred in instructing the jury that in order to identify it, they might take into account the time when the fence was built on block 128½, the fact that it was about the time of the survey when the corners were easily ascertained and all the other facts given in testimony which throw light upon the question, and if they believed the testimony warranted it they might presume the fence was built on the line of said block 128½. As regards the subject matter of this instruction, we think there is no error; it was in effect only permitting the jury to arrive at a fact from circumstantial evidence. Blackstone says that "next to positive proofs, circumstantial evidence, or the doctrine of presumptions must take place; for when the fact cannot be demonstratively evinced, that which comes nearest to the proof of the fact, is the proof of such circumstances as either necessarily or usually attend such facts. These are called presumptions." This presumption, however, must rest upon facts proved, for, when the main fact in respect of the subject matter in controversy, cannot be proved by direct testimony, such fact is arrived at by the proof of other facts so associated with the fact in question, that in the relation of cause and effect, lead to a satisfactory and certain conclusion. Therefore presumptive evidence consists in the proof of minor or other facts, incidental to or usually connected with the fact sought to be

proved, which when taken together, inferentially, establish or prove the fact in question to a reasonable degree of certainty.   We think the instruction was substantially in accordance with the principles of the law as above stated.   But in respect to the same question, at the request of the plaintiff in error, the jury were further instructed that unless they believed from the evidence that the land described in the petition, was the identical land described in the deed offered in evidence by the defendant in error, they must find for the plaintiff in error.   Hence, it seems clear from the record that the question of the identity of the land in controversy, was fairly and correctly submitted to the jury.

On the sixteenth day of January, 1858, the plaintiff in error, by deed sold and conveyed block 172½ to Samuel Moffat, and after several intervening conveyances of this title by deed, it vested in Miller who now claims title to the land by virtue of his deed to the property.   Horbach claims title to the land by virtue of an alleged adverse possession of the same.   It is, however, contended on the part of the defendant in error, that such adverse possession must have been for the term of twenty-one years, in order to establish a title to the land, because at the time the plaintiff in error entered into the possession of the land, such period of time was the statutory limitation.   But the act of February 12, 1869, changed the statutory period, and limits actions for the recovery of real estate to ten years; and the counsel for plaintiff in error contends that this latter act applies to this case, and fixes the time when his title becomes complete.   It will be observed that by this act it is specially provided that it shall not take effect until the first day of July, 1869.   Hence it is a question of construction as to what is the effect of this act on existing claims.   We think the rule is correctly laid down in the case of *Bigelow v. Bemen,* 2 *Allen,* 497, as follows: "It is well settled that it is competent for

the legislature to change statutes prescribing limitations to actions, and that the one in force at the time suit is brought is applicable to the cause of action. The only restriction on the exercise of this power is, that the legislature cannot remove a bar or limitation which has already become complete, and that no limitation shall be made to take effect on existing claims without allowing a reasonable time for parties to bring action before these claims are absolutely barred by a new enactment." In this case the court held that there was a reasonable and sufficient time given to bring the action between the time of the passage of the act and the time when it took effect. And in *Smith v. Morrison*, 22 *Pick.*, 433, it is held that what constitutes a reasonable time, in such case, is a question within the exclusive province of the legislature to determine. The ground on which the rule seems to be based is, that the right which the defendant has to bar an action by the statute of limitations, does not originate in or flow from any contract, and therefore this change of remedies does not impair private or vested rights which flow from or are incidental to contracts. Therefore these remedies may be altered or changed within reasonable limits, without impairing contracts or private or vested rights. *Bingham v. Bigelow*, 12 *Met.*, 273. In view of these principles of law it seems clear that the legislature, in the act of 1869, fixed the time to bring actions on existing claims to real estate, before such claims should be absolutely barred by the new enactment.

Now it is said that the elements of all title are possession, the right of possession, and the right of property; hence if the adverse occupant has maintained an exclusive, adverse possession for the full extent of the statutory limit, the statute then vests him with the right of property, which carries with it the right of possession, and therefore the title becomes complete in him. In *Atkyns v. Horde*, 1 *Burr*, 119, Lord Mansfield says that "twenty-

one years is a positive title;" in *Stokes v. Berry*, 2 *Salk.*, 421, it is held that this title will support ejectment; and in *Graffins v. Totenham*, 1 *Watts and Sergt.*, 488, it is said that the effect of the statute is such as to transfer to the adverse occupant the title against which it runs. Gibson, J., says that "the title of the original owner is unaffected and untrammeled till the last moment, and it is vested in the adverse occupant by the completion of the statutory bar; the transfer has relation to nothing which preceded it; the moment of conception is the instant of birth." Therefore "the operation of the statute takes away the title of the owner and transfers it in legal effect to the adverse occupier;" and "one who purchases the written title of the owner, buys a title which, by operation of law was fairly vested in the adverse occupant." *Schell v. The Williams Valley Railroad Co.*, 35 *Penn. State*, 204.

It is, however, insisted that there must not merely be possession, but that this possession must be under a claim of right for the whole statutory period. This is true; but the question is, what constitutes such a claim of right? In answer to this, it is only necessary to observe that the rule seems to be well settled that acts of notoriety, such as building a fence round the land, entering upon the land and making improvements thereon, raising crops and felling trees thereon, are presumptive evidence and evincive of intention to assert ownership over and possession of the property; and taxation of the land for a series of years to the person claiming it, and the payment of taxes by him are competent evidence tending to show ownership. *Elliott v. Pearl*, 10 *Pet.*, 412. *Allen v. Gilmore*, 13 *Maine*, 178. *Little v. Libey*, 2 *Greenleaf*, 242. *Miller v. Shaw*, 7 *Sergt. and Rawle*, 136. *Farrer v. Fessenden*, 39 *New Hamp.*, 277. *Angell on Limitations, Sec.* 395. So is possession made out by placing on the premises buildings and receiving

the rents and profits thereof. *Poignard v. Smith*, 6 *Pick.*, 177.

We think that under these rules of law, there was sufficient evidence offered on the trial to submit the case to the jury, to determine as a question of fact, whether the plaintiff in error had maintained his allegations of adverse possession, and the submissson of the case to the jury was, under the instructions of the court, at the request of the plaintiff in error, that if they believed from the evidence that the plaintiff in error, for ten years next before the commencement of the action, was in the actual, continued, and notorious possession of the land in controversy, claiming the same as his own against all persons, they must find for the plaintiff in error; and furthermore, that enclosing such land within a fence— the maintenance of such fence—cultivation of the land, and payment of taxes on the same for said period, with said intention, is sufficient in law to constitute adverse possession. We are satisfied that under these instructions, the question was fairly submitted to the jury, in accordance with the rules of law above stated, and that in this regard there was no error committed in the court below.

It is assigned for error that the court permitted a map of the town to be offered in evidence by the defendant in error, to the admission of which the plaintiff in error objected. The record does not show that any ground of objection was stated, and therefore it would be difficult for this court to determine, in this case, whether there was or was not error in this ruling of the court. In all such cases the objections should be stated, for if the evidence was admissible for any purpose, it should be admitted: and in this case the admission of the evidence was proper simply to show the jury the arrangement of the blocks and streets of the town, in connection with the testimony of the surveyor.

On the whole we think, as shown by the record there was no error, and the judgment should be affirmed.

JUDGMENT AFFIRMED.

MAXWELL, J., concurred. LAKE, Ch. J., having tried the cause in the court below, did not sit.